**IN RE INVESTMENT TECHNOLOGY GROUP, INC. SECURITIES LITIGATION**

No. 15 Civ. 6369 (JFK)

United States District Court,
S.D. New York.

Signed 04/26/2017

FOR PLAINTIFF METZLER IN-
VESTMENT GmbH: William H. Narwold,
Esq., Matthew P. Jasinski, Esq., Gregg S.
Levin, Esq., Lance V. Oliver, Esq., William
S. Norton, Esq., MOTLEY RICE LLC.

FOR DEFENDANTS INVESTMENT
TECHNOLOGIES GROUP, INC. AND
STEVEN R. VIGLIOTTI: George T. Con-
way III, Esq., WATCHTELL, LIPTON,
ROSEN & KATZ.

FOR DEFENDANT ROBERT C. GAS-
SER: John F. Baughman, Esq., Julian N.
Radzinschi, Esq., PAUL, WEISS, RIF-
KIND, WHARTON & GARRISON LLP.

FOR DEFENDANT MATS GOE-
BELS: John N. Orsini, Esq., Eric Seiler,
Esq., Jennifer A. Mustes, Esq., FRIED-
MAN KAPLAN SEILER & ADELMAN
LLP.

## OPINION & ORDER

JOHN F. KEENAN, United States
District Judge:

This is a putative securities class action
brought on behalf of all persons and enti-
ties who purchased or acquired the public-
ly traded common stock of Investment
Technology Group, Inc. ("ITG") between
February 28, 2011 and August 3, 2015 (the
"Class Period"). The defendants are ITG
and three current and former executives
who, according to the 122–page amended
complaint, allegedly made dozens of state-
ments between 2010 and 2015 that were
materially false or misleading in light of
the company's failure to disclose Project
Omega, a proprietary trading program
that improperly used or had access to con-
fidential customer trading information, and
the Securities and Exchange Commission
("SEC") investigation that ensued. As a
result of Project Omega's violation of sev-
eral securities regulations, ITG ultimately
agreed to pay a $20.3 million fine. After
disclosing Project Omega and its settle-
ment with the SEC, the company's stock
price dropped substantially.

The amended complaint alleges that the
defendants are liable under Sections 10(b)
and 20(a) of the Securities Exchange Act
of 1934 and Rule 10b–5. The defendants
move to dismiss the Section 10(b) and Rule
10b–5 claims on the grounds that the
amended complaint fails to plead any ac-
tionable material misstatement or omis-
sion, or a strong inference of scienter. The
defendants also argue that the amended
complaint fails to establish control person
liability under Section 20(a). For the rea-
sons set forth below, the Court grants in
part and denies in part the defendants'
motions to dismiss the amended complaint.

## BACKGROUND

The following facts, which are drawn
from the amended complaint (the "Com-
plaint") and documents incorporated by
reference, are accepted as true for the
purposes of the motions to dismiss filed by
Robert Gasser, Steven Vigliotti, and Mats
Goebels (the "Individual Defendants"), and
ITG (collectively, the "Defendants").

## I. The Parties

Lead Plaintiff Metzler Investment GmbH ("Plaintiff") is a German capital investment company. (Am. Compl. ¶ 73 [hereinafter Compl.].) Plaintiff's investment funds purchased approximately 100,-000 shares of ITG stock during the Class Period. (Id.) ITG is incorporated in Delaware and maintains its principal executive offices in New York City. (Id. ¶ 74.) Gasser was the company's CEO and president from October 2006 until August 1, 2015. (Id. ¶ 75.) Vigliotti was the company's CFO throughout the Class Period and still holds that position. (Id. ¶ 76.) Gasser and Vigliotti both signed ITG's Form 10–K filed annually with the SEC from 2010 to 2014 and the company's quarterly report for the first quarter of 2015. (Id. ¶¶ 75–76.) Goebels joined ITG in 1998 and was the company's General Counsel and a managing director until August 1, 2015. (Id. ¶ 77.) During the Class Period, Goebels was responsible for all legal and regulatory matters and signed the company's Form ATS [1] filed with the SEC on December 13, 2013 and later published on the company's website. (Id.)

ITG acts primarily as an agency securities broker, matching customer orders to buy (or sell) a security with orders to sell (or buy) that security. (See, e.g., id. ¶¶ 10, 13, 17.) The company also provides investment research and analytics products. (See, e.g., id. ¶ 60.) The company's flagship product is an alternative trading system, or "dark pool," known as POSIT. (Id. ¶¶ 2, 12.) When ITG launched POSIT in 1987, it was one of the first dark pools in existence. (Id. ¶ 2.) As of the spring of 2015, POSIT was the ninth largest dark pool, facilitating approximately $109 billion in trades per quarter. (Id. ¶ 11.)

Dark pools allow customers to trade securities outside the traditional exchanges making up the National Market System, such as the New York Stock Exchange and NASDAQ. (Id. ¶ 13.) Dark pools provide anonymity, allowing investors to trade without immediately revealing their identity or the size of the trade. (Id.) This prevents large trades from immediately moving the stock price and provides liquidity that might not otherwise exist. (Id.)

POSIT executes trades at or within the National Best Bid and Offer ("NBBO"). (Id. ¶¶ 31–32.) Under the NBBO, the "bid-ask spread" is the difference between the highest bid price and the lowest offer price. (Id. ¶ 31.) In other words, it is the difference between the highest price an investor is willing to pay for a security and the lowest price at which a person holding the security is willing to sell it. The information constituting the NBBO is supplied by a subscription program that consolidates and sells data from all exchanges. (Id.)

Customers in POSIT have three possible "pegs" that are linked to the NBBO: "passive," "midpoint," or "aggressive." (Id. ¶ 32.) A "passive" customer will only buy at the lowest NBBO price or sell at the highest NBBO price. (Id.) Conversely, if a customer chooses to be "aggressive," the customer is willing to buy at the highest NBBO price or sell at the lowest NBBO price. (Id.) A midpoint customer is willing to buy or sell in the middle of the spread. (Id. ¶ 33.)

Through POSIT, ITG built a brand as an independent agency broker. (Id. ¶ 15.) In other words, according to the Complaint, the company was known for facilitating trades rather than making trades

---

1. Form ATS is a confidential document filed with the SEC. (Compl. Ex. A ¶ 9 n.3.) "ATS" refers to "alternative trading system."

for its own account. ITG made several statements between 1999 and 2010 that Plaintiff contends highlighted this reputation. For example, ITG's 1999 Form 10–K stated: "We do not act as a market-maker with respect to any securities or otherwise act as a principal in any securities transactions; . we act only on an agency basis. Therefore, we do not have exposure to credit risks in the way that traditional broker-dealers have such exposure." (Id.) The company also highlighted POSIT's confidentiality, stating in .the same filing that POSIT allowed clients "to trade single stocks and portfolios of equity securities among themselves in a confidential environment," and explained that "[c]onfidential matching of buy and sell orders. eliminates market impact:" (Id. ¶ 14.)

## II. Project Omega .

In light of falling revenues during the economic crisis, in 2009, ITG's senior managers recommended that the company explore trading on its own account using algorithmic high frequency trading. (Id. ¶ 20.) Algorithmic trading uses computer programs to generate and execute orders in markets with electronic access. (Id.) High frequency trading refers to algorithmic trading executed at very high speeds. (Id.)

In or around early 2010, ITG's board and Gasser approved Project Omega, a limited scope proprietary trading desk. (Id. ¶ 21.) ITG ran Project Omega through AlterNet Securities, Inc., a broker-dealer subsidiary. (Id.) Gasser chose Hitesh Mittal—ITG's global head of liquidity management—to head Project Omega. (Id. ¶¶ 24–25.)

After engaging in simulated trading in January 2010, Project Omega started live trading for two weeks in April 2010 and then continued live trading again in June 2010. (Id. ¶ 27.) At the beginning of both live trading sessions, ITG's compliance department informed Mittal of certain limits on Project Omega's scope and access to information. (Id. ¶ 28.) Specifically, the compliance department instructed Mittal that Project Omega would not have access to information regarding POSIT's order flow and that the project would be prohibited from coordinating trading strategies or sharing execution information with non-Project Omega employees. (Id.)

Despite these directives, from April 2010 to December 2010 Project Omega employed two principal trading strategies that relied on ITG employees accessing confidential client trading data in POSIT. (Id. ¶ 30.) The two strategies—the "Facilitation Strategy" and the "Heatmap Strategy"—both involved high frequency buying and selling of stocks to make small profits between the purchase price and sale price within very short time frames. (Id.)

The Facilitation Strategy used a live feed of customer trading data called the Aleri Feed, which notified Project Omega of customer orders routed through POSIT. (Id. ¶ 35.) The Aleri Feed provided the Project Omega team with real-time data, including a customer's (1) client identifier; (2) symbol; (3) side (i.e., buy side or sell side); (4) the quantity of shares involved; (5) filled shares; (6) target price; (7) ITG algorithm in which the order was located; and (8) the time parameters. (Id. ¶ 36) This information was not available to customers of POSIT and was supposed to be confidential to counterparties in the dark pool. (Id.)

Using the Aleri Feed, Project Omega would detect an open customer order to buy certain securities in POSIT. (Id. ¶ 37.) Project Omega would then buy the relevant security at a favorable price in another market and sell it at a higher price to the POSIT customer. (Id.) For this process to work to Project Omega's advantage, the

POSIT customer would have to be pegged as "aggressive." (Id. ¶ 39.) For example, the Aleri Feed would identify an order to buy certain securities where the best buying price was $10.00 and the best selling price was $10.02 per share. (Id. ¶ 41.) The Project Omega team would then purchase the shares at $10.00 per share in another market. (Id.) If the customer was pegged as "aggressive," it would be willing to buy from Project Omega for the higher price of $10.02 per share. (Id.) This would allow Project Omega to earn the full bid-ask spread as profit. (Id.)

To make the Facilitation Strategy work, Project Omega had access to the identities of POSIT subscribers and used this information to determine which customers to trade with in POSIT. (Id. ¶ 38.) After trading, the Project Omega team could also determine which customers had been the most profitable to Project Omega. (Id.) Based on this analysis, the Project Omega team made decisions about whether to stop trading with certain customers or continue trading with others. (Id.) Typical POSIT customers did not have this information. (Id.) The Facilitation Strategy also allowed Project Omega to manipulate the pegs of POSIT customers without their knowledge. (Id. ¶ 39.) Mittal directed Project Omega software developers to coordinate with members outside the team to ensure that all traders interacting with Project Omega were pegged as aggressive or to change the client's peg to aggressive in order to facilitate a trade. (Id.)

From April 2010 to December 2010, Project Omega also used the Heatmap Strategy. (Id. ¶ 43.) This strategy involved trading on markets other than POSIT based on a live feed (the "Heatmap Feed") of confidential information from trades by ITG customers in external dark pools, not POSIT. (Id.) If the Heatmap Feed showed a number of trades in a given security at midpoint or better in a non-POSIT dark pool, then Project Omega would infer that someone would continue to transact at midpoint or better in that dark pool. (Id. ¶ 46.) So, for example, if the best purchase price for a certain security was $10.00 and the best selling price was $10.02, and the Heatmap Feed detected trades in the middle at $10.01, Project Omega would buy shares of the security for $10.00 and then sell the shares for $10.01 in the external dark pool, producing profits of $0.01 per share for ITG. (Id.)

In early-to-mid December 2010, ITG's compliance department and senior management learned about Project Omega's use of customer order information through the Facilitation Strategy and Heatmap Strategy and suspended the program's trading. (Id. ¶ 48.) The project was shut down from about December 9, 2010 to December 20, 2010, while ITG's compliance department reviewed Project Omega's activities to make a report to senior management. (Id. ¶ 49.) On or about December 20, 2010, ITG's senior managers met with the compliance department and Gasser reprimanded Mittal. (Id. ¶ 50.)

Following the meeting, ITG permitted Project Omega to resume live trading. (Id.) On December 21, 2010, Project Omega resumed a modified version of the Facilitation Strategy that did not involve access to the Aleri Feed. (Id. ¶ 51.) On January 24, 2011, Project Omega restarted a modified Heatmap Strategy without direct access to the Heatmap Feed. (Id.) Mittal continued to manage Project Omega and direct its trading strategies while also managing POSIT and ITG's trading algorithms, which included access to confidential customer order and trade information. (Id. ¶ 52.) Despite the removal of the direct feeds, Project Omega continued to have access to information identifying POSIT subscribers. (Id. ¶ 53.) The Pro-

ject Omega team also continued to coordinate with ITG's POSIT development team to identify the sell-side subscribers for Project Omega to trade with and to ensure that those subscribers were configured to trade "aggressively." (Id.) Project Omega continued to trade until July 2011, when ITG shut it down for good. (Id. ¶ 54.) Mittal also left ITG in July 2011, ostensibly as part of a "cost-cutting" measure. (Id. ¶ 55.)

### III. Alleged False Statements

The 122–page Complaint sets forth dozens of allegedly false or misleading statements. For purposes of clarity and economy, only a sample of these statements are quoted and described immediately below. The remaining allegedly false or misleading statements are referenced and analyzed throughout the Court's Opinion.

### A. Project Omega

Plaintiff alleges that ITG made numerous false or misleading statements in its SEC filings, press releases, and other public statements during the lifespan of Project Omega. Several of these statements were made before the beginning of the Class Period on February 28, 2011. For example, during a conference on December 9, 2010, Gasser stated that ITG is "an agent, which is in and of itself differentiated. We're not informed by your liquidity, by your order flow. We don't have a proprietary trading operation that takes advantage of that." (Id. ¶ 86.) Plaintiff contends that this statement was false or misleading because, from June 2010 through December 2010, Project Omega continued live proprietary trading using strategies that were informed by customers' order flow and movement in securities. (Id. ¶ 87.)

On the first day of the Class Period, February 28, 2011, ITG filed with the SEC its Form 10–K for 2010. (Id. ¶ 90.) By this time, ITG's senior management, including

Gasser, had allegedly met to discuss Project Omega and were aware of Mittal's misconduct. (Id. ¶ 50.) Project Omega no longer had access to the Aleri Feed or Heatmap Feed, but the Project Omega team allegedly continued to have access to information identifying POSIT subscribers and continued to coordinate with the POSIT development team to identify sell-side subscribers for Project Omega to trade with and to ensure that those subscribers were configured to trade "aggressively." (Id. ¶¶ 51–54.)

In its Form 10–K for 2010, ITG stated that it was an "independent agency research broker," that asset managers relied on the company's "independence," that POSIT provided "anonymous matching," and that POSIT incorporated technology "to help ensure that clients are protected from gaming." (Id. ¶¶ 90, 93.) In the same filing, ITG disclosed that "[a] portion of our revenues is derived from principal trading for our own account where we incur risk," but stated that "[a]ll such principal trading activity is conducted in accordance with applicable regulatory requirements, including those pertaining to the maintenance of information barriers." (Id. ¶ 95.) Plaintiff alleges that these statements were materially false and misleading because ITG was not an independent, agency-only broker, but instead was exploiting confidential client information through Project Omega to trade on its own account, and because ITG's intentional accessing of customer information violated SEC Regulation ATS, which requires, among other things, that an ATS establish safeguards and procedures to protect subscribers' confidential trading information. (Id. ¶¶ 91, 94, 96.)

According to the Complaint, ITG continued to make false or misleading statements in press releases and SEC filings covering the time period in which Project

Omega was in operation. For example, the company continued to describe itself as an "independent agency research broker," (id. ¶¶ 101, 106), and described POSIT as "[c]rossing destinations that give buyers and sellers opportunities to match equity orders with complete confidentiality." (Id. ¶ 100.) Plaintiff alleges that these statements were false or misleading in light of Project Omega's proprietary trading activities using customer information.

### B. Pipeline Controversy and Settlement

On October 24, 2011, several months after Project Omega ended, Pipeline Trading Systems LLC ("Pipeline"), an alternative trading system and ITG competitor, settled with the SEC for failing to disclose its proprietary trading. (Id. ¶ 62; see also Press Release, SEC, Alternative Trading System Agrees to Settle Charges That It Failed to Disclose Trading by an Affiliate, available at https://www.sec.gov/news/press/2011/2011–220.htm.) The next day, ITG sent a letter to its clients stating: "We strictly enforce the order handling and execution rules of [POSIT], which are clearly set forth in Form ATS on file with the Securities and Exchange Commission." (Compl. ¶ 113.) Soon thereafter, Jamie Selway, a managing director of ITG, gave an interview in which he stated that Pipeline "didn't describe in the Form ATS everything they were doing with their affiliate.... Moreover, they aggressively spoke about things that weren't true." (Id. ¶ 62.) Summing up Pipeline's transgressions, Selway said: "Pipeline cheated. We don't cheat." (Id. ¶¶ 62, 114.)

On a November 3, 2011 conference call to discuss ITG's financial performance for the third quarter of 2011, an analyst asked Gasser about the recent disclosures regarding Pipeline. (Id. ¶ 116.) Gasser responded:

I think you're being politically correct, Rich in calling it a faux pas to begin with. I would say that it's surprising, it's shocking, I think for everyone that's engaged in this space, whether or not you're buy-side or sell-side firm.

We've been very clear about our business model and how we execute our business. We've communicated that broadly to clients. As you know we've been talking about various elements of our business very publicly, particularly the sell-side and the spread trading business back to Q1 of '09, right and that is no way analogous to what Pipeline was doing, but certainly any nuance to our model we feel absolutely compelled to communicate very clearly and very transparently.

(Id.)

Plaintiff alleges that these statements were materially false or misleading because they gave the false impression that ITG had not engaged in similar misconduct as Pipeline and omitted that ITG had exploited confidential customer information and had violated Regulation ATS. (Id. ¶¶ 115, 117.) According to Plaintiff, Gasser's statements on the November 3, 2011 conference call also gave the impression that ITG's past representations regarding its business had been complete and transparent when, in fact, they had not. (Id. ¶ 117.)

### C. ITG's Business and Operations After Project Omega

The Complaint alleges that, after Project Omega, ITG continued to make the same or similar representations about its business practices as it had before and during the project. For example, the company's quarterly SEC filings in 2012 described ITG as an "independent execution and research broker." (Id. ¶ 127.) Likewise, on an August 9, 2012 conference call, Gasser stated: "ITG has a robust set of

risk controls across our platform to prevent major trading errors. Among the controls is our business model. We act as an agent, not a principal, in the vast majority of our trading globally." (Id. ¶ 137.) On December 18, 2012, Gasser made similar statements while testifying before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing and Urban Affairs. (Id. ¶ 146.) "ITG is not a market maker, and we do not take on proprietary positions," he said. (Id.) "In other words, we do not have skin in the game when it comes to the debates around broker internalization, as our system provides meaningful price improvement to buyside investors, as described in Reg NMS." (Id.) The Complaint cites dozens of similar statements regarding ITG's business between 2012 and 2015. (See, e.g., id. ¶¶ 111, 120, 137, 146, 158, 162). Although these statements were made after Project Omega was shut down, Plaintiff contends that they were materially false or misleading because they gave the false impression that, throughout its existence, including during Project Omega, ITG had maintained the same unconflicted business model, protected client information, and complied with applicable regulations.

### D. SEC Investigation

The SEC allegedly began investigating Project Omega by the fall of 2013, and by May 2015 had informed ITG that it intended to bring charges. (Id. ¶¶ 64, 171.) Plaintiff alleges that ITG made several statements in its SEC filings between 2013 and 2015 that were false or misleading in light of the ongoing SEC investigation. For example, ITG's Forms 10–Q and 10–K from the third quarter of 2013 to the end of 2014 included the following statements re-

garding the company's involvement in regulatory proceedings and investigations:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time, the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operations.[2]

(Id. ¶¶ 175, 196, 210, 231.)

Plaintiff contends that this statement was materially false or misleading each time it was made because, among other reasons, there was "a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning Project Omega." (See, e.g., id. ¶ 176.)

### IV. Disclosure of Project Omega and SEC Investigation

On August 12, 2015, the SEC announced a settlement with ITG and released an order instituting administrative and cease-and-desist proceedings against ITG and AlterNet. (Id. ¶ 66.) The order included a detailed admission of wrongdoing by ITG and AlterNet and an acknowledgement

---

**2.** A variation on this statement appeared in the company's Form 10–Q for the first quarter of 2015. (Compl. ¶ 238.) That statement is reproduced below with the Court's analysis of ITG's statements about regulatory proceedings.

that their conduct violated federal securities laws. (See generally id. Ex. A [hereinafter the "SEC Order"].) Specifically, the order stated that ITG and AlterNet had violated §§ 17(a)(2) and 17(a)(3) of the Securities Act by making untrue statements of material fact and material omissions to investors, and also stated that ITG had violated Regulation ATS. (SEC Order ¶¶ 79–80.) In connection with the settlement, ITG agreed to pay approximately $20.3 million in fines and disgorgement of profits, the largest monetary penalty ever imposed against a dark pool. (Compl. ¶¶ 7, 68.) Following the news of the settlement, ITG's stock price dropped 24 percent, from $24.00 per share on July 29, 2015, to $18.36 per share on July 30, 2015. (Id. ¶ 245.) As a result, ITG shareholders are alleged to have suffered millions of dollars in damages.

Plaintiff brings two causes of action in this suit. First, Plaintiff alleges that Defendants violated § 10(b) of the Securities Exchange Act and Rule 10b–5. (Compl. ¶¶ 362–368.) Plaintiff also asserts that the Individual Defendants violated § 20(a) of the Securities Exchange Act. (Id. ¶¶ 369–376.) Defendants have filed motions to dismiss the Complaint for failure to state a claim.

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). A complaint should not be dismissed if the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under § 10(b) of the Securities Exchange Act must meet the pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). See In re Sanofi Sec. Litig., 155 F.Supp.3d 386, 397–98 (S.D.N.Y. 2016). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); ATSI Commc'ns, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider "the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms

and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

## DISCUSSION

### I. Violation of § 10(b) of the Securities Exchange Act and Rule 10b–5

To state a claim for securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." Fragin v. Mezei, No. 09 Civ. 10287(AJN), 2012 WL 3613813, at *7 (S.D.N.Y. Aug. 22, 2012) (quoting Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000)). In other words, a plaintiff must establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

Defendants move to dismiss the Complaint for failure to adequately plead a material misrepresentation or omission and failure to plead a strong inference of scienter.

### A. False or Misleading Statements and Omissions

Rule 10b–5 makes it unlawful to "make any untrue statement of a material fact" or "to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). "A statement is misleading if a reasonable investor would have received a false impression from the statement." Freudenberg v. E*Trade Fin. Corp., 712 F.Supp.2d 171, 180 (S.D.N.Y. 2010). Such a determination is generally a question reserved for the trier of fact. See In re Par Pharm., Inc. Sec. Litig., 733 F.Supp. 668, 677 (S.D.N.Y. 1990). "Thus, the matter must go to a jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." Id.

With respect to omissions, the Supreme Court has instructed that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." Stratte–McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Thus, generally, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Id. (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)). A duty to disclose under Rule 10b–5 may arise "when there is 'a corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or mislead-

ing.'" Id. (quoting Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)); see also In re Lululemon Sec. Litig., 14 F.Supp.3d 553, 572 (S.D.N.Y. 2014). Even in the absence of an independent duty to disclose information, once a company speaks on an issue, it has a duty to be accurate and complete. See Meyer v. JinkoSolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014).

■ Regarding materiality, "[a] misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision." Freudenberg, 712 F.Supp.2d at 181; see also Basic, 485 U.S. at 240, 108 S.Ct. 978. However, like the question of whether a reasonable investor would find a particular statement "misleading," the question of whether a reasonable investor would find a particular misrepresentation or omission "material" to an investment decision is usually a matter reserved for the trier of fact. See In re Initial Pub. Offering Sec. Litig., 241 F.Supp.2d 281, 379 (S.D.N.Y. 2003) ("The question of materiality is rarely amenable to disposition as a matter of law."). Accordingly, the Second Circuit has held that "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

### 1. Class Period Statements Before Project Omega

■ According to the Complaint, Defendants made materially false or misleading statements and omissions prior to the Class Period, i.e., before February 28, 2011. (Compl. ¶¶ 78–87.) The Complaint, however, fails to state a claim based on these representations because, in the Second Circuit, a defendant is liable "only for those statements made during the class period." In re IBM Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998); see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F.Supp.3d 1, 17 (S.D.N.Y. 2016) (noting the "general rule that pre-Class Period statements are not actionable"). Accordingly, the pre-Class Period statements here are not actionable.

Moreover, Defendants had no duty to correct pre-Class Period misstatements. The Second Circuit has held that "the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period." Lions Gate, 165 F.Supp.3d at 17 (citing Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 154 (2d Cir. 2007)). Here, the duty to correct pre-Class Period statements, if such a duty existed, arose in December 2010, when Defendants allegedly learned about misconduct at Project Omega. (Compl. ¶¶ 48–50.) Because, as Plaintiff alleges, these statements and Defendants' awareness of errors in them took place prior to the Class Period, the duty to correct does not apply.

Accordingly, the statements set forth in paragraphs 78 to 87 of the Complaint are not actionable.

### 2. Class Period Statements During Project Omega's Operation

■ The Court finds that Plaintiff has alleged actionable statements or omissions while Project Omega was operating during the Class Period. (Id. ¶¶ 90–109.) First, Plaintiff alleges that, from February 28, 2011 to July 2011, Defendants touted ITG's "independence" and "independent agency research" model when, in fact, ITG was running Project Omega, a proprietary

trading operation to benefit its own account. (Id. ¶¶ 90, 98, 101, 106.) Second, Plaintiff alleges that Defendants highlighted POSIT as a product that preserved clients' anonymity and protected their confidential information when, in fact, ITG used or otherwise had improper access to confidential client information for Project Omega. (Id. ¶¶ 92–93, 100.) Third, Plaintiff alleges that Defendants emphasized ITG's compliance with applicable regulatory requirements—including Regulation ATS—when, in fact, ITG was in violation of a provision of Regulation ATS requiring safeguards to protect subscribers' confidential trading information. (Id. ¶¶ 95–96.)

Defendants argue that ITG's statements during this period were literally true and not misleading,[3] and that, in any event, they constitute inactionable puffery. At this stage, however, these statements amount to more than mere puffery. Puffery encompasses "statements [that] are too general to cause a reasonable investor to rely upon them," and, thus, is not misleading. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (quoting ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)); see also In re Moody's Corp. Sec. Litig., 599 F.Supp.2d 493, 509 (S.D.N.Y. 2009) ("[C]ourts have identified declaration of intention, hope, or projections of future earnings as the hallmarks of inactionable puffery."). However, more definite statements about a company's business practices may invoke reasonable reliance by investors, particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success. See Moody's, 599 F.Supp.2d at 509 (S.D.N.Y. 2009) (finding actionable defendants' representations about independence being a cornerstone of company's business where statements were "not couch[ed] . . . in the language of optimism or hope" but were, instead, " 'watchwords by which stakeholders' judged it"); Lapin v. Goldman Sachs Grp., Inc., 506 F.Supp.2d 221, 240 (S.D.N.Y. 2006) (finding actionable statements about defendants' integrity being " 'at the heart' " of its business and a point of distinction from competitors).

The statements at issue here are sufficiently definite and, moreover, related to "the heart" of ITG's business to qualify as actionable. A reasonable investor could find that ITG's "independent agency status" described a significant aspect of its business model that, according to the company, distinguished it from competitors. (See, e.g., Compl. ¶¶ 98 ("Our broad product set and independent agency status make ITG a trusted partner for many of the world's largest and most sophisticated institutional investors."), 90, 101.) Likewise, the Complaint plausibly alleges that ITG touted specific advantages of POSIT, its leading product, despite the fact that Project Omega's ongoing operations undermined its claims that POSIT allowed customers to remain "anonymous" and provided them with "complete confidentiality." (Id. ¶ 100.) These are not the type of vague or aspirational representations that warrant dismissal as puffery at this stage.

---

3. Defendants also contend that Project Omega was a limited and minor "experiment," and, thus, neither it nor the failure to disclose it was material. (Defs.' Mem. at 13, 16.) Accepting Plaintiff's allegations as true, as the Court must on a motion to dismiss, the Court cannot say that the Class Period representations that ITG employed an independent agency model, protected confidential client information, and was in compliance with Regulation ATS during the operation of Project Omega were "so obviously unimportant to a reasonable investor" as to be immaterial as a matter of law. See Goldman, 754 F.2d at 1067.

The disclosure in ITG's 2010 Form 10–K that "[a] portion of our revenues is derived from principal trading for our own account where we incur risk" does not cure the alleged misstatements as a matter of law. (Id. ¶ 95; Defs.' Mem. at 12–13.) Based on the Complaint, the key fact omitted from ITG's statements about its business practices is Project Omega's ongoing misconduct related to customer information, not that ITG operated a proprietary trading program. While Project Omega's live feeds of customer information ended in December 2010, the Project Omega team allegedly continued to have access to information identifying POSIT customers. (Compl. ¶¶ 51–53.) Moreover, the Project Omega team allegedly continued to coordinate with ITG's POSIT development team to identify the sell-side customers for Project Omega to trade with and to ensure that those customers were configured to trade "aggressively." (Id. ¶ 53.) A reasonable investor could find that ITG's failure to disclose this conduct made its representations during Project Omega misleading.

Defendants' argument that they had no duty to disclose any information about Project Omega presupposes that none of their Class Period statements were misleading. (Defs.' Mem. at 12.) For the reasons stated above, however, Plaintiff has plausibly alleged that Defendants made Class Period statements while Project Omega was operating that were "inaccurate, incomplete, or misleading." Stratte–McClure, 776 F.3d at 101 (quoting Glazer, 964 F.2d at 157). "Having chosen to speak" about specific features of its business model and the advantages it offered, ITG "had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place." In re BioScrip, Inc. Sec. Litig., 95 F.Supp.3d 711, 727 (S.D.N.Y. 2015) (internal quotation marks omitted) (citing Meyer, 761 F.3d at 250).

Defendants do not dispute Plaintiff's allegation that they misrepresented ITG's compliance with Regulation ATS in the Form 10–K for 2010. (Compl. ¶¶ 95–96.) Instead, they argue that Regulation ATS does not, on its own, impose a duty of public disclosure. (Defs.' Mem. at 12.) This argument misses the point. It is not Regulation ATS itself that gives rise to a duty of disclosure, but rather Plaintiff's allegation that ITG made an "inaccurate, incomplete, or misleading" representation of compliance with that regulation that imposed such a duty. See Stratte–McClure, 776 F.3d at 101 (quoting Glazer, 964 F.2d at 157). Plaintiff has adequately pleaded that the representation about compliance with Regulation ATS was false or misleading.

Accordingly, the statements set forth in paragraphs 90 to 104 and 106 to 109 are actionable. However, for the reasons stated later in this Opinion, the statement set forth in paragraph 105 is not actionable.

### 3. Class Period Statements After Project Omega Ended

A significant portion of the Complaint consists of allegedly false or misleading statements that describe or relate to ITG's business practices and operations after Project Omega was shut down for good in July 2011. (Compl. ¶¶ 110–241.) The Court finds that Plaintiff has plausibly alleged misleading statements by ITG regarding the Pipeline controversy and settlement. (Id. ¶¶ 113–117.) However, Plaintiff's claim that Defendants' post-Project Omega statements are misleading as to ITG's past practices must be dismissed because neither the present-tense terms of those statements nor the circumstances surrounding them support the inference that they describe ITG's past behavior.

### a. Statements Regarding the Pipeline Controversy and Settlement

Plaintiff has plausibly alleged actionable statements based on comments by

Gasser and Selway following Pipeline's settlement with the SEC. Specifically, Plaintiff alleges that these statements were false or misleading because they suggest that ITG, in contrast to Pipeline, complied with applicable laws and did not face any regulatory risk. Moreover, these statements directly responded to questions and concerns about the Pipeline controversy. (Id. ¶¶ 62, 113 (Gasser stating in letter to ITG clients: "We strictly enforce the order handling and execution rules of [POSIT], which are clearly set forth in Form ATS on file with the Securities and Exchange Commission."), 114 (Selway stating in interview: "Pipeline Cheated. We don't cheat."), 116 (Gasser responding to question from analyst that ITG's business "is [in] no way analogous to what Pipeline was doing")). Indeed, in Gasser's own words, Pipeline's misconduct was "shocking." (Id. ¶ 116.) According to the Complaint, however, ITG, like Pipeline, had "cheated" by engaging in misconduct that exposed the company to the risk of regulatory action. The Court concludes that these statements, considered in their context, could have given a reasonable investor a false impression about ITG's historical business operations and potential regulatory exposure.

Plaintiff has also plausibly alleged that Gasser falsely conveyed the impression that ITG's approach to communication about its business model was transparent and accurate, both in November 2011, when the statements were made, and previously. (Id. ("We've been very clear about our business model and how we execute our business. We've communicated that broadly to clients.... [C]ertainly any nuance to our model we feel absolutely compelled to communicate very clearly and very transparently.").) Gasser's statements regarding ITG's "transparent" approach belied the reality that ITG did not disclose details about Project Omega or the misconduct associated with it. These statements could have given a reasonable investor a false impression about the completeness of ITG's disclosures and the scope of their business operations.

Accordingly, the statements set forth in paragraphs 113 to 117 are actionable.

### b. Statements Regarding ITG's Post–Project Omega Business Operations and Practices

The remaining allegations of false or misleading statements after Project Omega ended in July 2011, however, are not actionable. From July 2011 through the first half of 2015, Plaintiff alleges various misrepresentations that generally can be sorted into five categories: (1) statements touting ITG's independence in press releases and SEC filings, (id. ¶¶ 111, 118, 127, 134–135, 154, 162, 184–185, 186, 203, 212, 218–219, 221, 233, 240); (2) statements touting the advantages of POSIT and ITG's other services in SEC filings and conference calls with analysts, (id. ¶¶ 120, 124, 129, 131, 144, 156, 164, 166, 188, 201, 205, 207, 214, 216, 223, 225, 235); (3) statements emphasizing ITG's agency model in press releases and conference calls with analysts, (id. ¶¶ 137–138, 140, 142, 152, 169); (4) Gasser's testimony before the U.S. Senate concerning ITG's business operations, (id. ¶¶ 146, 148, 150); and (5) ITG's compliance with Regulation ATS and controls to protect confidential client data, (id. ¶¶ 158, 190, 192, 227).

As an initial matter, these alleged post-Project Omega misrepresentations are generally worded in the present tense. (See, e.g., id. ¶¶ 118 ("ITG is an independent agency research broker that partners with asset managers globally...."), 140 ("ITG's unconflicted business model is at the heart of what we do...."), 150 ("[W]e safeguard our data using a combination of up-to-date technological measures, strictly

enforced information barriers, and robust policies and procedures concerning information security and protection of client confidential information."), 156 ("POSIT operates as an [ATS], providing anonymous continuous and scheduled crossing of non-displayed ... equity orders...."), 227 ("We continue to review and monitor POSIT's systems and procedures to ensure compliance with Regulation ATS.").) These statements, on their face, purport to describe only ITG's then-present state, not its past business operations or behavior. The Complaint does not contain allegations showing that the content of these statements was false or misleading as applied to ITG's conduct after Project Omega ended in July 2011.

Plaintiff nevertheless asserts that these present-tense statements were misleading because they gave false impressions about ITG's past conduct. (See, e.g., id. ¶¶ 130 ("[The statement] created the false impression that the Company had always traded in the best interests of its clients ... [when] in fact the Company had knowingly and unlawfully accessed and exploited confidential customer information to trade against its own customers...."), 217 ("[The statement] created the false impression that ITG was and always had been an independent research and execution broker and had always helped investors source quality liquidity....").) Plaintiff is correct that a statement, although literally true, can become misleading "through [its] context and manner of presentation." McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990). However, the Complaint fails to allege contextual features that make Defendants' post-Project Omega, present-tense statements misleading. These statements,

unlike those made in response to the Pipeline controversy and settlement, were phrased in an unambiguous tense and did not respond to a specific topic on which investors sought reassurance. Absent circumstances suggesting that these statements conveyed information about ITG's historical business practices, Plaintiff has not adequately pleaded that the statements were false or misleading.[4]

Accordingly, paragraphs 110 to 112 and paragraphs 118 to 241 of the Complaint do not plead actionable statements.

### 4. Statements Concerning Regulatory Investigations

The SEC allegedly began investigating Project Omega by the fall of 2013 and, by May 2015, had informed ITG that it "intended to bring serious charges." (Compl. ¶¶ 64, 171.) Plaintiff argues that the failure to disclose the SEC investigation made certain representations that appeared in ITG's public filings between 2013 and 2015 misleading. Plaintiff alleges two different types of misleading statement: (1) statements of fact about regulatory investigations and legal proceedings, and (2) statements of opinion about the likely impact of those regulatory investigations and legal proceedings.

#### a. Statements of Fact

 "[S]tatements of fact are actionable if they are materially misleading." Menaldi v. Och–Ziff Capital Mgmt. Grp. LLC, 164 F.Supp.3d 568, 583 (S.D.N.Y. 2016). Plaintiff alleges that, in light of the SEC's investigation, certain statements of fact that appeared in ITG's quarterly and annual public filings between 2013 and 2015 were misleading. The first allegedly misleading statement (the "Regularly In-

4. The same logic applies with respect to the statements contained in the Form ATS Amendment, signed by Goebels, that ITG filed with the SEC in December 2013 and posted online in May 2014. (Compl. ¶¶ 177–183.)

volved Statement") appeared in ITG's Form 10–Q for the third quarter of 2013:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operations.

(Compl. ¶ 175.) ITG repeated this statement in its Form 10–Q for the first, second, and third quarters of 2014, as well as its Form 10–K for 2013 and 2014. (Id. ¶¶ 196, 210, 231.)

A similar statement that appeared in ITG's Form 10–Q for the first quarter of 2015 contained several new features:

> The Company is not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. The Company's broker-dealer subsidiaries are involved in ongoing investigations and other proceedings by government agencies and self-regulatory organizations regarding its business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. The Company is unable to provide a reasonable estimate of any potential liability given the stage of such proceedings. However, the

Company believes, based on the information currently available, that the outcome of such proceedings, individually or in the aggregate, will not likely have a material adverse effect on its consolidated financial position. In light of the inherent uncertainties of such proceedings, however, an adverse outcome of such proceedings may have a material impact on the results of operations for any particular period.

(Id. ¶ 238.)

The second allegedly misleading statement (the "Periodically Involved Statement") appeared in ITG's Form 10–K for 2013:

> The Company is periodically involved in litigation and various legal matters that arise in the normal course of business, including proceedings relating to regulatory matters. Such matters are subject to many uncertainties and outcomes that are not predictable. At the current time, the Company does not believe that any of these matters will have a material adverse effect on its financial position or future results of operations.[5]

(Id. ¶ 196.) ITG repeated this statement in its Form 10–K for 2014. (Id. ¶ 231.)

Plaintiff contends that these statements misled investors by disclosing that ITG was "regularly involved" in "investigations and proceedings by government agencies" and "periodically involved" in "proceedings relating to regulatory matters," but omitting that the SEC was investigating Project Omega. (Pl.'s Mem. in Opp. at 23–24.) Defendants accurately note that "a government investigation, without more, does not trigger a generalized duty to disclose." Lions Gate, 165 F.Supp.3d at 12. However, "the question here is not whether [Defen-

---

5. The Court analyzes the last respective sentence of the Regularly Involved Statement and the Periodically Involved Statement, which constitute statements of opinion, below.

dants] had an independent duty" to announce the SEC investigation. Menaldi, 164 F.Supp.3d at 584. Rather, the question "is whether, in light of that [i]nvestigation, the statements [Defendants] chose to make were materially misleading." Id.

A trio of recent cases from this district bears on the question of when a company's statements about government investigations may plausibly mislead a reasonable investor. See Lions Gate, 165 F.Supp.3d at 10–16; BioScrip, 95 F.Supp.3d at 725–28; see also Menaldi, 164 F.Supp.3d at 582–85. In Menaldi, the plaintiffs plausibly alleged materially misleading statements when the defendants received subpoenas from the SEC and requests for information from the Department of Justice in 2011 and, in subsequent public filings, mischaracterized the threat the company faced, especially in light of a more detailed disclosure in a restated Form 10–K.[6] 164 F.Supp.3d at 583–84. The result was similar in BioScrip, where the plaintiffs plausibly alleged materially misleading statements when the defendants received a civil investigative demand from the federal government in 2012 and, in subsequent public filings, made statements "that a reasonable investor could have read ... to mean that BioScrip was not already in receipt of just such a request for information."[7] 95 F.Supp.3d at 727. In contrast, in Lions Gate, the plain-

tiffs failed to allege a materially misleading statement when the SEC issued subpoenas to the company and certain individual defendants in 2011 and, in subsequent public filings, the company stated that "[f]rom time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business."[8] 165 F.Supp.3d at 15. The analysis in these cases is necessarily fact-specific, however, the distinction among them appears to turn closely on whether the disclosure language at issue is phrased in terms that appear hypothetical or speculative, as in Menaldi and BioScrip, or in terms that convey current investigative activity, as in Lions Gate.

Here, the Court concludes that the Regularly Involved Statement and the Periodically Involved Statement, read completely and in context, are neither false nor so incomplete as to mislead a reasonable investor. The initiation and ongoing nature of the SEC investigation did not make ITG's statements that it was "regularly" or "periodically" involved in regulatory investigations and matters factually inaccurate. Nor could those statements have given a reasonable investor the impression that ITG was not actively involved in investigations. Indeed, when read in conjunction with the portions of the disclosures that refer to ITG's opinions based on the "in-

---

**6.** In Menaldi, the statements at issue included: "Like other businesses in our industry, we are subject to scrutiny by regulatory agencies"; "From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business"; and "This [scrutiny] has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas." 164 F.Supp.3d at 583.

**7.** In BioScrip, the statements at issue included: "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies," and "[t]here can be no assurance that we will not

receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time." 95 F.Supp.3d at 726–27.

**8.** The remainder of the Lions Gate disclosure read: "While the resolution of these matters cannot be predicted with certainty, the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements." 165 F.Supp.3d at 15.

formation currently available" and "at the current time," the Regularly Involved Statement and the Periodically Involved Statement suggest that regulatory investigations were live and ongoing, rather than merely hypothetical or speculative possibilities. Cf. Menaldi, 164 F.Supp.3d at 583 ("This [scrutiny] has resulted or may in the future result in regulatory agency investigations . . . ."); BioScrip, 95 F.Supp.3d at 727 ("There can be no assurance that we will not receive subpoenas or be requested to produce documents . . . ."). Here, as in Lions Gate, Plaintiff "at most pleads that the defendants disclosed an investigation was ongoing, but refused to provide details." 165 F.Supp.3d at 16. Accordingly, these statements are not actionable.

Plaintiff's argument that the Regularly Involved Statement and the Periodically Involved Statement were "boilerplate" and "insufficiently generic" is unavailing. So long as their statements were not misleading, Defendants were not required to provide more detailed disclosures. See Lions Gate, 165 F.Supp.3d at 16 ("A corporation, however, 'only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead.'" (quoting In re Bristol Myers Squibb Co. Sec. Litig., 586 F.Supp.2d 148, 160 (S.D.N.Y. 2008))). Furthermore, the other factual statements that appear in the Regularly Involved Statement and the Periodically Involved Statement are not actionable. The Complaint contains scarce details about the SEC investigation between the fall of 2013 and May 2015, and, thus, fails to establish anything untrue about ITG's statements that the legal and regulatory matters in which it was involved were "subject to many uncertainties and outcomes that are not predictable." (Compl. ¶¶ 196, 231.)

■ Finally, Plaintiff alleges that ITG made a third allegedly misleading state-ment (the "No Significant Change Statement") in its Form 10–Q for every quarter throughout the Class Period: "There has been no significant change to the risks or uncertainties that may affect our results of operations since [the end of the period covered by the preceding Form 10–K]." (Id. ¶¶ 105, 122, 133, 168, 173, 209, 237.) The No Significant Change Statement is followed by a sentence referring to "Item 1A" in the immediately preceding Form 10–K for more information. See, e.g., Inv. Tech. Grp., Inc., Quarterly Report (Form 10–Q) (Aug. 9, 2011) ("There has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2010. Please see Item 1A in our Annual Report on Form 10–K for the year ended December 31, 2010."). Item 1A in ITG's Form 10–Ks provides an extensive list of risk factors, described at a fairly high level of generality, faced by the company. See, e.g., Inv. Tech. Grp., Inc., Annual Report (Form 10–K) (Feb. 28, 2012).

■ The Court concludes that these statements are not actionably misleading. Plaintiff argues that the No Significant Change Statement was misleading throughout the Class Period because Defendants allegedly knew about misconduct at Project Omega and, later, that the SEC was investigating. (Pl.'s Opp. at 24.) As an initial matter, "the federal securities laws do not require a company to accuse itself of wrongdoing." In re Citigroup, Inc. Sec. Litig., 330 F.Supp.2d 367, 377 (S.D.N.Y. 2004). Moreover, Plaintiff does not explain how the risks or uncertainties described in ITG's annual Form 10–K–which contemplate business concerns faced by the company and industry at large, were updated and published on a yearly basis, and do not address discrete instances of litigation or regulatory action—underwent a "significant change" at any point. Rather, the

broadly outlined risks identified in ITG's annual Form 10–K remained fairly constant from year to year.

Accordingly, paragraphs 105, 122, 133, 168, 173, 175, 196, 209, 210, 231, 237, and 238 of the Complaint do not plead actionable statements.

### b. Statements of Opinion

▉ Plaintiff further alleges that, in light of the SEC investigation, certain statements of opinion that appeared in ITG's quarterly and annual SEC filings between 2013 and 2015 were misleading. The allegedly misleading statements of opinion appear in the final sentence of the Regularly Involved Disclosure and Periodically Involved Disclosure, respectively. The first statement reads: "Although there can be no assurances, at this time the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operation." (Compl. ¶¶ 175, 196, 210, 231; see also id. ¶ 238.) The second statement reads: "At the current time, the Company does not believe that any of these [various legal] matters will have a material adverse effect on its financial position or future results of operations." (Id. ¶¶ 196, 231.)

▉ Under Second Circuit authority, liability for a statement of opinion lies "to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d. Cir. 2011). The Supreme Court

recently weighed in on this standard, holding that liability for making a false statement of opinion may lie if: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact [the speaker] supplied were untrue"; or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." [9] Tongue v. Sanofi, 816 F.3d 199, 209–10 (2d Cir. 2016) (citing Omnicare, Inc., v. Laborers Dist. Council Const. Indus. Pension Fund, —— U.S. ——, 135 S.Ct. 1318, 1326–27, 1332, 191 L.Ed.2d 253 (2015)). In determining whether a statement of opinion is misleading based on a failure to disclose facts underlying the opinion, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id. (quoting Omnicare, 135 S.Ct. at 1329). To make this showing, a plaintiff must

> identify particular (and material) facts going to the basis for the [defendant's] opinion—facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Omnicare, 135 S.Ct. at 1332.

▉ Plaintiff argues that the opinion statements at issue here were "without a basis in fact" because Defendants were aware that Pipeline had paid a "significant fine" for similar misconduct and that ITG was under investigation by the SEC. (Pl.'s Mem. in Opp. at 25 (quoting In re Oxford

---

9. As another court in this district recently observed, the Second Circuit "has not directly held that Omnicare applies" to § 10(b) or Rule 10b–5 claims. SEC v. Thompson, 14–cv–9126 (KBF), 238 F.Supp.3d 575, 601, 2017 WL 874973, at *17 n.13 (S.D.N.Y. Mar. 2, 2017). "However, several recent cases suggest that Omnicare would apply to all antifraud provisions of the securities laws." Id. (collecting cases); see also Tongue, 816 F.3d at 209–14 (analyzing claims arising under various securities fraud provisions, including § 10(b) and Rule 10b–5, without distinguishing among those provisions).

Health Plans, Inc., Sec. Litig., 187 F.R.D. 133, 141 (S.D.N.Y. 1999)).) Plaintiff, however, does not allege that Defendants subjectively disbelieved their own opinion, nor does it allege that they embedded an untrue fact. See Omnicare, 135 S.Ct. at 1326–27. The statements of opinion, then, are only actionably misleading under Omnicare if they omitted to state facts that would "conflict with what a reasonable investor would take from the statement itself." Id. at 1329.

As to this inquiry, the Second Circuit has noted that the Supreme Court's example of an issuer's statement of belief that its conduct is lawful is "particularly instructive." Tongue, 816 F.3d at 214. "Such a statement does not imply that the issuer's conduct is, in fact, lawful, but only that the issuer has conducted a meaningful inquiry and has a reasonable basis upon which to make such an assertion." Id.; see also Omnicare, 135 S.Ct. at 1328–29 (a reasonable investor does not understand statements of opinion as "guarantees," but rather expects that assertions "rest on some meaningful ... inquiry" and that an issuer's opinion "fairly aligns with the information in [its] possession at the time").

▐ Plaintiff does not allege that Defendants, in issuing the statements of opinion, failed to conduct a meaningful inquiry or were without an adequate basis for their assertions. To be sure, Plaintiff disagrees with the opinions at issue, specifically the conclusion that no legal or regulatory matter was expected to have a "material adverse effect." (Pl.'s Mem. in Opp. at 24.) However, an opinion statement "is not necessarily misleading when" a defendant "knows, but fails to disclose, some fact cutting the other way," because a "reasonable investor does not expect that every fact known to [a defendant] supports its opinion statement." Omnicare, 135 S.Ct. at 1329 (emphasis in original).

Thus, Plaintiff may disagree with Defendants' opinion, but "so long as Defendants conducted a 'meaningful' inquiry and in fact held [the stated] view, the statements did not mislead in a manner that is actionable." Tongue, 816 F.3d at 214.

Additionally, Plaintiff fails to allege particular facts regarding the knowledge Defendants did (or did not) possess at the time the opinion statements were made, whose omission made those statements misleading. The Complaint states generally that the SEC investigation began in late 2013. (See, e.g., Compl. ¶¶ 64 ("By the fall of 2013, the SEC commenced an investigation into Project Omega."), 171 ("According to published news reports, the SEC Investigation began no later than the fall of 2013.").) However, the Complaint fails to allege facts connecting the timing of the SEC investigation with Defendants' knowledge of the investigation, stating, in conclusory fashion, only that "Defendants were put on notice of the SEC investigation" at the same time as it allegedly commenced. (Id. ¶ 285.) Other courts in this district, analyzing similar opinion statements regarding legal matters and expected consequences, have found statements actionable where the plaintiff concretely alleged that the defendants, before making the opinion statement at issue, knew facts whose omission made the opinion statement misleading. See, e.g., Menaldi, 164 F.Supp.3d at 574–75, 583–84 (complaint alleged that defendant company received subpoenas from the SEC and requests for information from Department of Justice prior to making actionable statements); BioScrip, 95 F.Supp.3d at 729–32 (complaint alleged that United States served defendant company with a civil investigative demand prior to company's actionable opinion statements). Here, in contrast, Plaintiff fails to "identify particular ... facts ... whose omission makes the opin-

ion statement at issue misleading." See Omnicare, 135 S.Ct. at 1332.

Accordingly, paragraphs 175, 196, 210, 231, and 238 of the Complaint do not plead actionable statements of opinion.

## B. Scienter

Defendants also move to dismiss the Complaint on the ground that Plaintiff has failed to allege a strong inference of scienter. In light of the Court's analysis above regarding actionable statements, the Court need only consider the sufficiency of the scienter allegations with respect to two categories of statements: (1) Class Period statements during Project Omega's operation, and (2) statements regarding the Pipeline controversy and settlement.

 The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). To state a claim under § 10(b) and Rule 10b–5, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To qualify as a "strong inference," the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." ECA, 553 F.3d at 198 (quoting Tellabs, 551 U.S. at 314, 127 S.Ct. 2499). In the case of a corporate defendant, a plaintiff need only plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

 In the Second Circuit, a plaintiff may establish scienter in either of two ways: by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." Stratte–McClure, 776 F.3d at 106 (quoting ATSI Commc'ns, 493 F.3d at 99). As to the second method of establishing scienter, "courts have approved of claims when plaintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" Pirnik v. Fiat Chrysler Autos., N.V., 15–CV–7199 (JMF), 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016) (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)).

As explained below, the Complaint contains adequate allegations to support a strong inference of scienter as to Gasser and ITG. However, it fails to plead a strong inference of scienter as to Goebels or Vigliotti.

### 1. Gasser

 Plaintiff has adequately pleaded Gasser's scienter with respect to the actionable Class Period statements. A strong inference of scienter may arise where a complaint sufficiently alleges that a defendant "knew facts or had access to information suggesting that [its] public statements were not accurate." ECA, 553 F.3d at 199 (quoting Novak, 216 F.3d at 311). To establish that defendants "knew facts or had access to information contradicting their public statements," a plaintiff "must identify specific contradictory information that was available to the ... [d]efendants at the time they made their misleading statements." Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp., 874 F.Supp.2d 341, 358 (S.D.N.Y. 2012). Here,

the Complaint alleges that, by December 2010 at the latest, Gasser was aware that Project Omega had accessed and used confidential client information to benefit ITG's proprietary trading account. (Compl. ¶ 50.) Gasser reprimanded Project Omega's manager, but took no further action to ensure that Project Omega was barred from accessing confidential client information. (Id. ¶¶ 50, 53.) Then, after Project Omega resumed operation in late 2010, it continued to have access to confidential client information until it was permanently discontinued in July 2011. (Id. ¶¶ 52–54.) Thus, Plaintiff plausibly alleges that Gasser "knew facts or had access to information suggesting that" ITG's statements between February and July 2011 regarding its "independent agency status," safeguarding of client confidentiality and anonymity, and compliance with Regulation ATS were "not accurate."[10] (Id. ¶¶ 90–109.) These "allegations alone are enough to satisfy the pleading requirement for scienter." Freudenberg, 712 F.Supp.2d at 197 (quoting Heller v. Goldin Restructuring Fund, L.P., 590 F.Supp.2d 603, 622 (S.D.N.Y. 2008)); see also Pirnik, 2016 WL 5818590, at *7 ("[I]t is enough at this stage for Plaintiffs to allege that Defendants were aware of nonpublic facts contradicting their public representations. . . .").

Several additional considerations support the Court's conclusion that a reasonable person would deem the inference of Gasser's scienter "cogent and at least as compelling as any opposing inference" one could draw from the facts alleged. See Tellabs, 551 U.S. at 314, 127 S.Ct. 2499.

For example, Gasser made pre-Class Period statements denying that ITG conducted any proprietary trading, even though he participated in the initial decision to approve Project Omega and even when it was currently operating.[11] (Compl. ¶¶ 21–22, 78–87.) Additionally, Gasser made statements in November 2011—after Project Omega ended—attempting to distinguish Pipeline's "shocking" and in "no way analogous" misconduct and reassure the public that ITG had always communicated transparently about its business model. (Id. ¶ 116.) Considering "all of the facts alleged, taken collectively," including Gasser's statements before, during, and after Project Omega's operation, the Court concludes that the Complaint gives rise to a strong inference that Gasser acted with the required state of mind. See S. Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 111 (2d Cir. 2009) (emphasis in original) (quoting Tellabs, 551 U.S. at 323, 127 S.Ct. 2499).

For similar reasons, Plaintiff has also sufficiently pleaded Gasser's scienter with respect to the actionable November 2011 statements concerning the Pipeline controversy and settlement. (Compl. ¶¶ 113–117.) Gasser's awareness of Pipeline's misconduct and October 2011 SEC settlement can be readily inferred from his contemporaneous statements, which cast Pipeline's behavior in stark contrast to ITG's. (Id. ¶¶ 113 ("We strictly enforce the order handling and execution rules of [POSIT.]"), 116 (ITG's business "is [in] no way analogous to what Pipeline was doing").) As

---

10. Indeed, Defendants do not really dispute that Gasser had knowledge that ITG engaged in proprietary trading or that Project Omega improperly used and had access to confidential client information. Rather, as noted previously, Defendants argue that the allegedly false or misleading Class Period statements during Project Omega's operation were literally true or mere puffery. (Defs.' Mem. at 15–16.)

11. While pre-Class Period statements "cannot themselves give rise to liability," they "can be relevant for showing whether defendants had knowledge that their later statements were false." In re Refco, Inc. Sec. Litig., 503 F.Supp.2d 611, 643 (S.D.N.Y. 2007).

noted above, Gasser, by this time, allegedly knew that ITG had piloted a proprietary trading program (i.e., Project Omega) and was aware of undisclosed misconduct associated with that program related to protecting confidential client information. Gasser, thus, "knew facts or had access to information suggesting that" his public statements comparing ITG and Pipeline "were not accurate." See ECA, 553 F.3d at 199 (quoting Novak, 216 F.3d at 311). At this stage, these allegations are sufficient to survive Defendants' arguments for dismissal.

### 2. Goebels and Vigliotti

██ The situation is different, however, with respect to Goebels and Vigliotti. The Court concludes that, with respect to them, Plaintiff fails to allege the cogent and compelling inference of scienter that is required. See Tellabs, 551 U.S. at 314, 127 S.Ct. 2499. Rather, the allegations set out in the Complaint are insufficient to establish a strong inference of scienter as to Goebels or Vigliotti under either the "motive and opportunity" prong or the "conscious misbehavior or recklessness" prong. See Stratte–McClure, 776 F.3d at 106.

Plaintiff contends that Class Period sales of ITG stock by Goebels demonstrate his motive and opportunity to commit fraud in connection with the allegedly misleading or false statements. (Pl.'s Mem. in Opp. at 35–37.) "To plead a strong inference of scienter through 'motive and opportunity to commit fraud,' a plaintiff must allege that a defendant 'benefitted in some concrete and personal way from the purported fraud.'" Sanofi, 155 F.Supp.3d at 405 (quoting ECA, 553 F.3d at 198). Typically, motive is shown by alleging that corporate insiders made a misrepresentation in order to sell their own shares at a

profit. See ECA, 553 F.3d at 198. To show motive based on trading by insiders, a plaintiff must establish that trading was unusual or suspicious. See Glaser v. The9, Ltd., 772 F.Supp.2d 573, 587 (S.D.N.Y. 2011). Courts consider a variety of factors in evaluating whether trading is unusual or suspicious. See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74–75 (2d Cir. 2001); Glaser, 772 F.Supp.2d at 587.

Here, Plaintiff alleges that Goebels sold 65,161 shares during the Class Period, generating total proceeds of $971,910.[12] (Compl. ¶ 292.) Plaintiff contends that the timing of a portion of these stock sales was suspicious, given the proximity of the sales to the fall of 2013, i.e., when the SEC allegedly began its investigation. (Id. ¶¶ 290–291; Pl.'s Mem. in Opp. at 35). However, several considerations cut against a finding of motive. First, as noted above, the only actionable statements occurred during the Class Period operation of Project Omega (i.e., from February 28, 2011 to July 2011) and in the fall of 2011 (regarding the Pipeline controversy and settlement). The bulk of Goebels' Class Period stock sales took place on August 27, 2012 or after. (Compl. ¶ 292.) The fact that most of Goebels' Class Period stock sales took place more than one year after Project Omega ended does not give rise to a strong inference of Goebels' scienter as to the actionable statements during Project Omega's operation. Second, Plaintiff's allegations concern the total proceeds garnered by Goebels' stock sales, not the net profits. (Id.) A number of courts in this district have found that allegations do not support a finding of "motive and opportunity" when net profits are not pleaded. See In re eSpeed, Inc. Sec. Litig., 457 F.Supp.2d 266, 290 (S.D.N.Y. 2006); see

---

**12.** Plaintiff also alleges that Gasser sold 106,000 shares during the Class Period, generating total proceeds of $1,931,516. (Compl. ¶ 287.) The Court has already considered the issue of Gasser's scienter, above.

also Glaser, 772 F.Supp.2d at 587; In re Regeneron Pharms., Inc. Sec. Litig., No. 03 Civ. 3111 RWS, 2005 WL 225288, at \*22 (S.D.N.Y. Feb. 1, 2005). Third, the absence of allegations regarding Vigliotti's trading during the Class Period undercuts the inference of scienter both as to him as well as his co-defendants. See In re Gildan Activewear, Inc. Sec. Litig., 636 F.Supp.2d 261, 271–72 (S.D.N.Y. 2009); see also Scholastic, 252 F.3d at 75. Accordingly, Plaintiff has failed to plead a strong inference of scienter under the "motive and opportunity" prong.

■ Plaintiff's allegations with respect to Goebels and Vigliotti are also insufficient under the "conscious misbehavior or recklessness" prong. As an initial matter, Plaintiff does not show with particularity that Goebels or Vigliotti knew facts or had access to information suggesting the inaccuracy of the actionable statements. See ECA, 553 F.3d at 199. Rather, Plaintiff attempts to show that they had knowledge that the actionable statements were not accurate by virtue of their positions (as General Counsel and CFO, respectively) and because both were managing directors. (Compl. ¶¶ 76–77.) For example, Plaintiff alleges that "senior managers" participated in the decision to approve Project Omega. (Id. ¶¶ 20, 242, 262, 327.) Plaintiff also alleges that ITG's "compliance department" and "senior management" learned about misconduct at Project Omega in December 2010. (Id. ¶¶ 48–50, 58, 262, 327.) Based on this chain of inference, Plaintiff asserts that Goebels and Vigliotti knew facts suggesting that the actionable statements were not accurate. (Pl.'s Mem. in Opp. at 28.) "Scienter, however, 'cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any ad-

verse information.'" Sanofi, 155 F.Supp.3d at 407 (quoting Foley v. Transocean, Ltd., 861 F.Supp.2d 197, 212 (S.D.N.Y. 2012)).

Plaintiff argues that Goebels' resignation from ITG in August 2015 constitutes supplemental evidence of his scienter. (Pl.'s Mem. in Opp. at 33–34.) According to an article published in the Wall Street Journal in August 2015, Goebels "left the firm in a move related to the dark pool case." (Compl. ¶¶ 249, 272.) The stated source for this information was "people familiar with the matter." Bradley Hope & Sarah Krouse, ITG Ousts CEO Gasser After Probe, Wall St. J., Aug. 3, 2015, available at https://www.wsj.com/articles/itg-ousts-ceo-gasser-after-probe-1438647154. Another court in this district has found, under nearly identical circumstances, that such a "vague description of the source provides no basis for the Court to evaluate its reliability." City of Brockton Ret. Sys. v. Avon Prods., Inc., No. 11 Civ. 4665(PGG), 2014 WL 4832321, at \*23 (S.D.N.Y. Sept. 29, 2014); cf. Novak, 216 F.3d at 313–14 (holding that a plaintiff may rely on confidential sources "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Given the similarly "vague" description of the source here—as well as the unexplained connection drawn by the article between Goebels' resignation and "the dark pool case"—the Court does not accord much weight to the fact of Goebels' resignation in evaluating his scienter.

Additionally, Plaintiff argues that application of the "core operations" theory bolsters the inference of scienter as to Goebels and Vigliotti. (Pl.'s Mem. in Opp. at 29–30.) The theory "permits an inference that a company and its senior executives have knowledge of information concerning

the 'core operations' of a business." In re Hi–Crush Partners L.P. Sec. Litig., No. 12 Civ. 8557(CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). The continued viability of the core operations theory, however, is uncertain. See Frederick v. Mechel OAO, 475 Fed.Appx. 353, 356 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives [the enactment of the PSLRA] as a viable theory of scienter."). Even assuming the theory remains viable, recent case law within this Circuit indicates that reliance on a "core operations" inference may provide "supplemental support" for establishing scienter, but is not independently sufficient. See New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 Fed.Appx. 10, 14 n.3 (2d Cir. 2011); see also Lipow v. Net1 UEPS Techs., Inc., 131 F.Supp.3d 144, 163 (S.D.N.Y. 2015) (collecting cases). Where, as here, Plaintiff's other scienter allegations with respect to Goebels and Vigliotti are not persuasive, the Court declines to find that Plaintiff's reliance on the core operations theory yields the cogent and compelling inference required.

Accordingly, as to Goebels and Vigliotti, Plaintiff has failed to plead scienter under the "conscious misbehavior or recklessness" prong as well.

### 3. ITG's Corporate Scienter

■ Gasser's adequately pleaded scienter may be imputed to ITG. "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F.Supp.2d 241, 265 (S.D.N.Y. 2010); see also Sanofi, 155 F.Supp.3d at 409 (stating that "courts have readily attributed the scienter of management-level employees to corporate defendants" and collecting cases). Gasser was ITG's CEO and president from October 2006 until August 2015 and acted in that

capacity when the allegedly false or misleading statements were made. (Compl. ¶ 75.) Accordingly, the Court concludes that Gasser's scienter may be imputed to ITG with respect to the actionable Class Period statements during Project Omega's operation and regarding the Pipeline controversy and settlement.

## II. Control Person Liability Under Section 20(a) of the Securities Exchange Act

■ In addition, Plaintiff alleges that the Individual Defendants violated § 20(a) of the Securities Exchange Act. To state a claim under § 20(a), a plaintiff must allege facts showing: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108. Plaintiff argues that Gasser, Goebels, and Vigliotti are controlling persons. (Compl. ¶ 372.) As explained above, Plaintiff has sufficiently alleged a primary violation of Rule 10b–5 and § 10(b) by a controlled person, namely ITG. See BioScrip, 95 F.Supp.3d at 740. Thus, Plaintiff has pleaded the first element of control person liability.

■ As to the second element, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." In re Tronox, Inc., Sec. Litig., 769 F.Supp.2d 202, 208 (S.D.N.Y. 2011) (quoting CompuDyne Corp. v. Shane, 453 F.Supp.2d 807, 829 (S.D.N.Y. 2006)). Nevertheless, courts have held that an officer's control as to financial statements, for example, is sufficiently pleaded if the officer has signed financial statements containing materially false or misleading statements. See In re Virtus Inv. Partners, Inc. Sec. Litig., 195 F.Supp.3d 528, 542 (S.D.N.Y.

2016). Here, Gasser, as CEO, allegedly spoke on ITG's behalf and signed relevant SEC filings. (See, e.g., Compl. ¶¶ 90, 101, 113, 116.) These allegations are sufficient at the pleading stage to show that Gasser exercised control over ITG. See Virtus Inv. Partners, 195 F.Supp.3d at 543. Accordingly, Plaintiff has pleaded the second element of control person liability as to Gasser.

As to the third element, a plaintiff "must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b)." Cohen v. Stevanovich, 722 F.Supp.2d 416, 435 (S.D.N.Y. 2010); see also In re Shengda-Tech, Inc. Sec. Litig., No. 11 Civ. 1918(LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (stating that "culpable participation is a scienter requirement" and collecting cases). As explained above, Plaintiff adequately alleges that Gasser acted with knowledge that the actionable statements were not accurate, thereby satisfying the culpable participation element. See Virtus Inv. Partners, 195 F.Supp.3d at 542. However, given that the Complaint fails to adequately show a cogent and compelling inference of scienter as to Goebels and Vigliotti in the § 10(b) context, it also fails to show their culpable participation in the § 20(a) context. See ShengdaTech, 2014 WL 3928606, at *11.

Accordingly, Plaintiff states a viable control person claim under § 20(a) against Gasser, but not as to Goebels or Vigliotti.

### III. Leave to Amend

Defendants seek dismissal of Plaintiff's claims with prejudice. In a footnote in its opposition, Plaintiff requests leave to amend if all or part of the Complaint is dismissed. (Pl.'s Mem. in Opp. at 39 n.11.) Rule 15 of the Federal Rules of Civil Procedure instructs a court to "freely give leave" to amend "when justice so requires." FED. R. CIV. P. 15(a)(2). However, amendment "is not warranted absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 Fed.Appx. 32, 37 (2d Cir. 2014) (quoting Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004)). Accordingly, should Plaintiff wish to amend its Complaint, its motion must demonstrate how it will cure the deficiencies in its claims and that justice requires granting leave to amend, and the motion shall be filed within 30 days of the date of this Opinion.

### CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Complaint are GRANTED IN PART and DENIED IN PART. The motion to dismiss Plaintiff's claims under § 10(b) and Rule 10b–5 as to defendants Gasser and ITG is DENIED. The motion to dismiss Plaintiff's claim under § 20(a) against Gasser is also DENIED. The motion to dismiss Plaintiff's § 10(b), Rule 10b–5, and § 20(a) claims are GRANTED as to defendants Goebels and Vigliotti, as well as to the extent the Complaint asserts inactionable statements, which the Court has identified above.

If Plaintiff wishes to amend the Complaint, it shall move this Court to do so no later than 30 days from the date of this Opinion. Otherwise the Court will enter an order dismissing Plaintiff's claims against Goebels and Vigliotti with prejudice, and Gasser and ITG shall file their answers to Plaintiff's remaining claims no later than 14 days from the date of that order.

If Plaintiff moves to amend the Complaint, Gasser and ITG's time to answer will be adjourned pending the Court's decision on Plaintiff's motion to amend.

The Clerk of the Court is respectfully requested to terminate the motions docketed at ECF Nos. 46 and 50.

**SO ORDERED.**